**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **THOMAS ANDREWS DRAKE,** | * | **Case No.  RDB 10 CR 181** |
| | * | |
| **Defendant.** | * | |
| | ****** | |

**MOTION IN LIMINE TO PRECLUDE EVIDENCE OF NECESSITY, JUSTIFICATION,**
**OR ALLEGED "WHISTLEBLOWING"**

The United States of America, by and through William M. Welch II, Senior Litigation

Counsel, and John P. Pearson, Trial Attorney, Public Integrity Section, Criminal Division,

United States Department of Justice, hereby move this Court to enter an order precluding the

introduction of evidence, examination of witnesses, or argument by counsel regarding the

defendant's perceived need or justification to expose waste and abuse at the National Security

Agency ("NSA"), or regarding the merits or substance of any claims of waste and abuse at NSA.

This is a case about the illegal retention of classified documents.  Absent express

approval, no contractor or employee of NSA can bring documents home, whether classified or

unclassified.  The defendant in this case did precisely that, with no authority or approval

whatsoever.  The defendant's motive for his conduct is irrelevant, and any attempt to inject a

necessity or "whistleblower" defense into this case should be rejected because the defendant

cannot legally or factually satisfy the elements of the defense.

Furthermore, any attempt to litigate the defendant's views of various NSA programs, or

to introduce evidence of the merits or substance of any claims of waste and abuse at NSA, will

needlessly confuse and distract the jury.  It will transform this criminal trial into a series of mini-

1

trials about NSA budget priorities and procurement processes.  Countless hours and additional witness testimony will be wasted on issues entirely irrelevant and immaterial to the clear rule in this case:  no contractor or employee of NSA can bring classified documents home without proper authority.

## I.   FACTS & PROCEDURAL HISTORY

### A.   Relevant Facts

#### 1.   <u>Background of the Defendant</u>

The defendant was employed as a private contractor for NSA from 1991 through August 2001, when he became a full time civilian employee.  He worked at NSA in several different capacities until April 23, 2008, when he resigned in lieu of termination.  From August 2001 through September 2006, the defendant was assigned to the Signals Intelligence Directorate (SID) at NSA's Fort Meade, Maryland facility.  From September 2006 until his resignation, the defendant was assigned to the National Defense University as an instructor.

Throughout his employment with NSA, both as a contractor and employee, the defendant repeatedly signed written security agreements acknowledging his duty to safeguard "protected information," which the written agreements expressly defined as classified information or information in the process of a classification determination that he obtained as a result of his employment relationship with the NSA.  The defendant acknowledged that he would never divulge protected information without the prior consent of the NSA, and that he had read and understood the provisions of the Espionage Act, including 18 U.S.C. § 793, in each one of these security agreements.  All of the security agreements signed by the defendant also stated that documents or information he intended for public disclosure had to be submitted for pre-

publication review by NSA prior to dissemination, and that the defendant had to notify NSA of any unauthorized disclosure of classified information.  The defendant signed written security agreements on December 7, 1989, August 20, 1991, June 30, 1998, May 1, 2000, and August 28, 2001.

At no time did the NSA authorize the defendant to de-classify information or to disclose classified information to unauthorized persons, nor did he ever obtain declassification of any of the classified documents and information referenced in this indictment.  Additionally, at no time did the NSA authorize the defendant to copy and print classified information in a manner that removed its classification markings and make it appear, on its face, as if unclassified.  At no time did the NSA authorize the defendant to possess classified documents or information at home, on a home computer, or in a personal e-mail account.  Finally, assistance with an IG audit or investigation is not an exception to these clear rules.

2.      DOD IG Audit of Classified Programs

No later than 2001, the defendant became aware of Classified Program A.  Classified Program A was an NSA program that provided a comprehensive architecture to collect Signals Intelligence.  In or about 1999, the defendant also became aware of Classified Program B. Although Program A and Program B were had some similarities, they were distinct in scope and objective.  Classified Program A and Classified Program B were not comparable programs because Classified Program A dealt with a number of different collection platforms, while Classified Program B dealt with a single type of information collection platform.  In or about 2002, the NSA reduced funding and staffing for Classified Program B.  Three former NSA employees who worked on Classified Program B and a former Congressional staffer eventually

formed the opinion that that too much funding was being directed to Classified Program A when less expensive and more effective options were available, including Classified Program B.  In or about August 2002, the former NSA employees, all of whom were personal friends of the defendant, filed a complaint with the Department of Defense Office of Inspector General (DOD IG) regarding Classified Program B.  The DOD IG included this complaint in its ongoing audit of Classified Program A.

The defendant knew of the former employees' complaints regarding Classified Programs A and B, and he agreed with them.  He also knew of the former employees' plan to file a complaint letter and assisted them in drafting the letter.  Notably, however, the defendant did not sign the complaint letter sent to the DOD IG.  Nor did he ever contact the National Security Agency's Office of Inspector General (NSA IG) regarding these issues.  The defendant eventually contacted two DOD IG auditors assigned to the audit of Classified Program A.  He provided them information, documents, and his opinion regarding Classified Program A's alleged shortcomings, as well as similar information regarding Classified Program B's alleged advantages.  The defendant never informed the auditors of his contact or personal relationships with the complaint's authors, however, instead presenting himself as an "honest broker" during the process.

In or about December 2004, the DOD IG completed its audit of Classified Program A, including the allegations raised in the complaint letter.  The NSA responded in August 2004 and February 2005, stating that based on the judgments of NSA's experienced technical experts, the allegations were unfounded.  Nonetheless, NSA agreed to incorporate significant portions of Classified Program B into Classified Program A as a result of the DOD IG recommendations,

thus largely mooting the issues raised in the complaint.  In addition, starting in late 2005 and early 2006, the NSA transitioned away from Classified Program A to Classified Program No. 1, another corporate architecture solution for Signals Intelligence collection.

In November 2005, the former Congressional staffer contacted the defendant and asked him if he would speak to a news reporter, known as Reporter A, about Classified Program B. The defendant ultimately agreed to this request.  The defendant signed up for an email account with Hushmail, a secure e-mail service that enable him to exchange secure emails with others without disclosing his true identity.  The defendant eventually contacted Reporter A, and in February 2006, he purchased a premium Hushmail account that allowed him to send encrypted emails and store encrypted documents on the Hushmail servers, which were located in Canada, which further allowed the defendant to conceal his communications.

Using both the Hushmail system and eventually in-person meetings, the defendant provided information to and reviewed stories by Reporter A regarding the NSA.  On behalf of Reporter A, the defendant actively collected classified documents about Classified Program No. 1, which was never the subject of the DOD IG audit, and other topics and took them home. Between early 2006 and November 28, 2007, Reporter A published a series of stories about the NSA, including several articles that contained classified information.  While one of these stories discussed Classified Program A, the defendant was not a source for that article because that article pre-dated his relationship with Reporter A.  Although another story discussed Classified Program B, the other stories by Reporter A had nothing to do with either Classified Programs A or B.

3.      The NSA and FBI Investigation

After the publication of these news articles, the NSA's Office of Counter- intelligence (OCI) opened an investigation into whether classified information had been provided to Reporter A.  By analyzing internal NSA computer records, the OCI  learned that the defendant had accessed, downloaded, and printed information from an internal computer system called NSANet that was similar to the information found in Reporter A's articles.  Based upon this and other information developed during their investigation, the OCI referred the matter to the Federal Bureau of Investigation (FBI).  The FBI and OCI eventually developed probable cause to believe that the defendant may have been providing information to Reporter A, and investigators obtained a search warrant to search the defendant's home, located in Glenwood, Maryland.

The FBI executed the warrant on November 28, 2007.  During the search, FBI agents found numerous documents that appeared to contain classified information.  These documents included both soft copy documents that had been scanned on to the defendant's home computer, as well as physical pieces of paper—hard copy documents—located in the defendant's basement. Agents also found hard copy documents that appeared to have the top of the page cut off, indicating that the "header" had been removed.[1]

By cross-checking the documents found in the defendant's home against emails he sent or received using his classified NSA work email, as well as his Internet history on NSANet, agents confirmed that the documents found in the defendant's home had been removed from the NSA.  An Original Classification Authority (OCA) reviewed a number of the documents and confirmed that they contained highly classified information.  The documents, for example,

---

[1]  Classified documents are required to have a header and footer stating the classification of the information contained in the document.  The defendant later admitted to the FBI that he had taken hard copy documents from the NSA and removed the tops of those pages.

contained information regarding NSA mission locations, technical capabilities, and budgetary funding details.

Interviews conducted with the defendant on November 28, 2007, December 14, 2007, and April 18, 2008 confirmed much of the information found during the warrant execution. The defendant admitted that he had taken NSA documents home, and that he had done so by copying NSA emails and documents into a Microsoft Word document, then printing the document. He also admitted that he had in some instances cut the header off NSA documents before bringing them home. He also admitted that he had provided information about NSA programs to Reporter A, both in person and using Hushmail emails.[2]

### B.       Procedural History

On April 14, 2010, the defendant was charged in a ten count indictment. The first five counts each charge the defendant with retaining classified information, in violation of 18 U.S.C. § 793(e), based on classified documents found in his home during the November 2007 search. Count Six charges the defendant with obstruction of justice, in violation of 18 U.S.C. § 1519, based on his destruction and concealment of documents in order to obstruct the FBI's investigation. Counts Seven through Ten each charge the defendant with making a false statement, in violation of 18 U.S.C. § 1001, for his lies to the FBI during his three interviews.

Notably, only three of the charges in the indictment have any relation to Classified Program B, and even these have nothing to do with the merits of Classified Program B. The other charges relate to documents found in the defendant's home which do not reference

---

[2]  The defendant made several false statements, which form the substance of Counts Seven through Ten  in the indictment.  In substance, the defendant claimed that he never gave Reporter A classified information, did not bring any classified documents home, removed only unclassified information from classified documents by copying and pasting it into a Word document, and never took handwritten notes that contained classified information.

Classified Programs A or B, or to obstruction of justice or false statements by the defendant in reaction to the FBI and NSA investigation into his conduct.  None of the charges relate to the DOD IG audit of Classified Program A.

## II.   ANALYSIS

The defendant has recently requested that the government produce documents related to the DOD IG audit of Classified Program A.  Based on these requests, as well as statements by counsel for the defendant, the government believes that the defendant may seek to argue or introduce evidence that his conduct was justified or that his claims were meritorious.  Because of the need to expose NSA waste and abuse regarding Classified Programs A and B, the argument proceeds, the defendant's possession of classified documents was necessary, justified, or well-intentioned, and thus non-criminal.

This Court should reject any attempt to introduce argument or evidence on these points, whether advanced through voir dire, opening statement, testimony, cross-examination, jury instructions, or closing argument.  This prohibition should apply whether the defendant attempts to support such a claim under the traditional common-law defense of necessity or through some other means, such as the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8).

The government strongly disputes the defendant's allegations regarding Classified Programs A and B.  However, even if those allegations were true, and Classified Program B was improperly de-funded in favor of Classified Program A, the defendant cannot make out the elements of a necessity defense under Fourth Circuit law.  Similarly, the statutory whistleblower defenses enumerated in the WPA do not apply, because this is a criminal, rather than civil prosecution.  Finally, the introduction of such evidence would transform this criminal case into

mini-trials about the competing merits of Classified Programs A and B, require additional testimony from more witnesses, and needlessly distract the jury from the true issues in this case.

### A.     The Necessity Defense

1.     Applicable Law

The Fourth Circuit has adopted a clearly defined test for defendants seeking to offer a necessity or justification defense.[3]  The "essential elements of the defense are that defendants must have reasonably believed that their action was necessary to avoid an imminent threatened harm, that there are no other adequate means except those which were employed to avoid the threatened harm, and that a direct causal relationship may be reasonably anticipated between the action taken and the avoidance of the harm."  United States v. Cassidy, 616 F.2d 101, 102 (4th Cir. 1979) (internal citations omitted).

The Fourth Circuit has also held that "the courts of appeals have construed the justification defense 'very narrowly' and applied it 'only on the rarest of occasions.'"  United States v. Gilbert, 430 F.3d 215, 219 (quoting United States v. Perrin, 45 F.3d 869, 874, 875 (4th Cir. 1995)).  Failure to establish any of these three elements means that a defendant may be precluded from, among other things, receiving discovery, having experts appointed, or offering evidence to support the alleged defense at trial.  Cassidy, 616 F.2d at 102.

---

[3] As explained in United States v. Gore, 592 F.3d 489, 491 n. (4th Cir. 2010), at common law necessity defenses were distinct from self-defense.  "More recent cases have grouped the defenses of duress, self-defense, and necessity 'under a single, unitary rubric:  justification.'"  Id. (quoting United States v. Jones, 254 Fed. Appx. 711, 721 (10th Cir. 2007) (unpublished op.)).  The Seventh Circuit has also explained the similarities between these defenses, combining them into the "set of lesser-evil defenses that includes duress, necessity, and self-defense."  United States v. Haynes, 143 F.3d 1089, 1091 (7th Cir. 1998) (discussing United States v. Bailey, 444 U.S. 394, 415–17 (1980)).

In <u>Cassidy</u>, the defendants "threw or poured blood and ashes on the walls and ceiling of the Pentagon in the course of a demonstration against the design and possession of nuclear weapons." <u>Id.</u> at 101.  They sought to justify their conduct on the ground that it constituted "a necessary defense to illegal possession by the United States of nuclear weapons." <u>Id.</u> at 102.  "In order to present this defense," the court noted, "they requested the court to appoint experts to testify concerning the nature of the United States' nuclear arsenal and policies and the legality of these weapons and policies under international law." <u>Id.</u>

The trial court refused to appoint the experts or admit the evidence, and the Fourth Circuit upheld these rulings under the three-point test quoted above. <u>Id.</u>  Even assuming the first prong—a reasonable belief that action was necessary to avoid an imminent harm—was satisfied, the defendants had not established "a lack of other adequate means or direct causal relationship." <u>Id.</u> (internal citations omitted).

The Fourth Circuit has rejected similar improper jury instructions that require evidence of "bad motive" or "bad purpose" in order to convict.  In <u>United States v. Moylan</u>, for example, the defendants were charged with "willfully" destroying government property, namely draft records, by removing them from a local draft board building and burning them.  417 F.2d 1002, 1003 (4th Cir. 1969).  The defendants argued that the district court erred when it refused their instruction that "no violation occurred unless defendants performed the admitted acts with a bad purpose or motive.  Their position was and is that since they acted from good motives, i.e., to protest which they sincerely believed was not only illegal but immoral, they could not have 'wilfully' violated the statutes and must be acquitted." <u>Id.</u> at 1004.

Moylan soundly rejected this argument, holding that "To read the term 'willfully' to require a bad purpose would be to confuse the concept of intent with that of motive." Id.  The Fourth Circuit clearly stated that while the trial court may have admitted evidence of the defendants' motives, "whatever motive may have led them to do the act is not relevant to the question of the violation of the statute, but rather is an element proper for the judge's consideration in sentencing." Id.

Cases that reject proffered necessity defenses, after applying the test espoused in Cassidy and the principles laid down in Moylan, are legion.  See, e.g., United States v. Maxwell, 254 F.3d 21 (1st Cir. 2001) (upholding exclusion of proffered evidence of necessity); United States v. May, 622 F.2d 1000 (9th Cir. 1980) (upholding exclusion of evidence and denial of discovery motion for the production of documents); United States v. Dorrell, 758 F.2d 427 (9th Cir. 1985) (upholding government motion in limine to exclude evidence and redact irrelevant portions of defendant's statement); United States v. Ayala, 289 F.3d 16 (1st Cir. 2002) (upholding exclusion of entire necessity defense); United States v. Sued-Jimenez, 275 F.3d 1 (1st Cir. 2001) (upholding exclusion of proffered evidence and expert testimony, and denial of discovery requests related to the necessity defense); United States v. Best, 44 F. Supp. 34 (D. Co. 1979) (rejecting claim of First Amendment infringement and excluding "a justification defense of any sort, be it choice of evils, necessity, or something similar masquerading under another name").  Of these, three bear particular mention here.

In United States v. Maxwell, the First Circuit analyzed the necessity claim of a protester who entered the U.S. Navy installation known as Camp Garcia on the island of Vieques, Puerto

Rico.  254 F.3d 21, 23 (1ˢᵗ Cir. 2001).  The defendant sought to admit evidence that his conduct

was justified based on the following proffer:

> "the grave risks triggered by the deployment of Trident nuclear submarines are a
> far greater evil than the commission of a criminal trespass designed to stop their
> deployment; harm was imminent in that Maxwell suspected that at least one
> Trident submarine already was present in the waters off Puerto Rico to participate
> in the training exercises; he reasonably believed that his disruption of the
> exercises would lead to dispersion of the Trident submarine(s); and, having
> previously taken a wide variety of political actions to no avail, he had no practical
> alternative but to break the law.  Id. at 27.  The district precluded the defense at
> trial, and it also excluded the defendant's proposed expert testimony related to the
> defense.

Id. at 26.

The First Circuit upheld the exclusion, noting first that although "a criminal defendant

has a wide-ranging right to present a defense, . . . this does not give him a right to present

irrelevant evidence."  Id. (citing In re Oliver, 333 U.S. 257, 273–74 & n. 31 (1948)).  "Thus,

when the proffer in support of an anticipated affirmative defense is insufficient as a matter of law

to create a triable issue, a district court may preclude the presentation of that defense entirely."

Id. (citing United States v. Bailey, 444 U.S. 394, 414–15 (1980) (finding it "essential" that

defendant's proffered evidence on a defense meet a minimum standard as to each element before

that defense may be submitted to jury)).  This rule applies to a criminal defendant seeking to

present a necessity defense.  Id. (internal citations omitted).

The defendant in Maxwell argued that this turned the statute into a strict liability offense.

Id. at 26.  But the court explained that: "The question before us is not whether necessity ever can

be a proper defense . . ., but, rather, whether Maxwell showed that he could muster some

evidence of a viable necessity defense."  Id.  at 26–27.

In analyzing the proposed necessity defense, the First Circuit used the same test applicable in this case.  Id. at 27.  It assumed that deployment of the submarines constituted a harm.  Id.  However, the record contained no evidence to support any claim of imminent harm. Id.  Further, if a submarine had been present, the court doubted  the "mere presence of such a vessel, without some kind of realistic threat of detonation, would suffice to pose an imminent harm."  Id. (internal citation omitted).

The defendant also could not show he had no legal alternative.  The defendant catalogued his unsuccessful attempts to further nuclear disarmament, but the court held that this "panoramic range of his activities clearly demonstrates that he has many legal options for advancing his political goals."  Id. (internal citation omitted).  Simply put, the defendant had numerous opportunities to protest nuclear action without breaking the law.  The court also held that the low likelihood of success through these alternatives was irrelevant: "The fact that Maxwell is unlikely to effect the changes he desires through legal alternatives does not mean, ipso facto, that those alternatives are nonexistent. . . .  Accepting such an argument would be tantamount to giving an individual carte blanche to interpose a necessity defense whenever he becomes disaffected by the workings of the political process."  Id. at 29.

The court also held that the defendant failed to show a reasonable anticipation of averting harm.  "A defendant must demonstrate cause and effect between an act of protest and the achievement of the goal of the protest by competent evidence.  He cannot will a causal relationship into being simply by the fervor of his convictions (no matter how sincerely held)." Id. at 28 (collecting cases, including Cassidy, 616 F.2d at 102).  The court found that there was no connection between the training exercises at Camp Garcia and presence of Trident

submarines, and, more importantly, that there was no connection between the defendant's actions and the movement of the submarines.  Id.  As a result, the trial court's decision to exclude the defense and proposed expert testimony in support of it was upheld.  Id. at 29.

The Ninth Circuit reached the same result in United States v. May, 622 F.2d 1000, 1008–09 (9th Cir. 1980).  Protestors in that case trespassed at the Naval Submarine Base in Bangor, Washington, again seeking to disrupt the Trident nuclear submarine program.  Id. at 1002.  The trial judge rejected their proffered defenses of necessity and justification based on international law.  Id. at 1008.  The Ninth Circuit upheld this decision, agreeing that "there was no reasonable belief that a direct consequence of their actions would be the termination of the Trident program."  Id. [4]

The Ninth Circuit also upheld the exclusion of evidence, including the proposed testimony of the defendant himself, in United States v. Dorrell, 758 F.2d at 430.  There, the defendant was tried and convicted for willfully injuring property of the United States, in violation of 18 U.S.C. § 1361, and for knowingly entering a military reservation for an unlawful purpose, in violation of 18 U.S.C. § 1382.  Id. at 429.  The defendant entered an MX missile assembly plant at Vandenburg Air Force base, and he admitted his intent was to damage MX missiles and that he had spray painted political slogans on the missile assembly building.  Id. After his attorney "intimated that Dorrell intended to assert the necessity defense," Dorrell

---

[4] Notably, in May, the Ninth Circuit also affirmed the trial court's rejection of the defendant's discovery motion "for the disclosure of specified documents relating to the targeting plans of strategic weapons and contamination from nuclear submarines."  Id. at 1010.  The court upheld this decision on the same ground that it upheld the decision to reject the trial defense:  "What we have just said supports the denial.  The evidence sought related to an irrelevant matter."  Id.  See also Sued-Jimenez, 275 F.3d at 7 (holding that "[g]iven our affirmance of the district court's preclusion of the necessity defense, any evidence relating to this defense that might be obtained through discovery is irrelevant.").

Case 1:10-cr-00181-RDB   Document 53   Filed 02/25/11   Page 15 of 28

proffered that he and three other witnesses would testify to the threat of nuclear war and he

would introduce a videotape explaining his motivations for his actions.  Id.

      The government moved to preclude this evidence in a motion in limine, which the trial

court granted.  Id. at 430.  On appeal, the defendant claimed that the evidence should have been

admitted, and that if he had failed to establish the necessary elements, the proper response would

"have been to decline to give a jury instruction on necessity."  Id.  The Ninth Circuit upheld the

trial court's rejection of this defense, and it echoed Maxwell in its discussion of the necessity

defense:

> Admittedly, a criminal defendant has the right to have a jury resolve disputed
> factual issues.  Where the evidence, even if believed, does not establish all of the
> elements of a defense, however, the trial judge need not submit the defense to the
> jury.  Accordingly, we have in the past allowed the district court to determine the
> admissibility of the necessity defense by motions in limine.  The sole question
> presented in such situations is whether the evidence, as described in the
> defendant's offer of proof, is insufficient as a matter of law to support the
> proffered defense.  If it is, then the trial court should exclude the defense and the
> evidence offered in support.

Id. (internal citations omitted).

      The court held that the defense was improper because legal alternatives existed.  Id. at

432.  It recited the numerous avenues by which the defendant could have lodged political protest

against the MX missile program, and it explained: "Those who wish to protest in an unlawful

manner frequently are impatient with less visible and more time-consuming alternatives.  Their

impatience does not constitute the 'necessity' that the defense of necessity requires."  Id. at 431.

"The defense of necessity does not arise from a 'choice' of several sources of action," the court

held, "it is instead based on a real emergency."  Id. (quoting United States v. Lewis, 628 F.2d

1276, 1279 (10th Cir. 1980)).

As in <u>Maxwell</u>, the court rejected the argument that because political protests failed, they were inapplicable to the necessity analysis.  <u>Dorrell</u>, 758 at 432.  "In this respect," the court held, "Dorrell differs little from many whose passionate beliefs are rejected by the will of the majority legitimately expressed. . . .  To accept Dorrell's position would amount to recognizing that an individual may assert a defense to criminal charges whenever he or she disagrees with a result reached by the political process."  <u>Id.</u>  The defendant also could not show his actions "would bring about the ends he sought."  As in the other protest cases, there was simply no way that the defendant's protest could reasonably be anticipated to cause the termination of the program.  <u>Id.</u> at 433.

Finally, the court upheld the trial court's decision to fully exclude the evidence, rather than simply refusing a jury instruction on the necessity defense.  <u>See id.</u> at 433 & n.5.  The court also upheld the decision to admit only portions of the defendant's handwritten statement, with the parts of the statement involving the defendant's motivations redacted.  <u>Id.</u> at 434.  Although the defendant argued that he was entitled to introduce these redacted portions under the "rule of completeness" embodied in Federal Rule of Evidence 106, the court disagreed, noting that because the redacted portions dealt with an irrelevant matter—the defendant's motivations—the redactions were proper.. <u>Id.</u> at 434–35.  The court held that the redaction "did not create a misleading impression by taking matters out of context," nor was the defendant prejudiced by the omission."  <u>Id.</u> at 435.

      2.   <u>Analysis</u>

Any argument or evidence that the defendant's retention of classified documents was necessary or justified, or that his claims of waste and abuse had merit, should be precluded.

Applying the three factors laid out in <u>Cassidy</u>, it is clear the defendant cannot demonstrate his conduct was necessary.  In addition, this Court should refuse any jury instruction on either a necessity defense or a requirement of bad motive or purpose, and it should instruct the jury that evidence of motive, however pure or impure, is irrelevant.

(a)      <em>Whether The Defendant Faced Imminent Harm</em>

The first prong of the <u>Cassidy</u> test requires the defendant to demonstrate he chose the lesser of two evils, and that the evil avoided was an imminent harm.  Unlike the Vietnam War or nuclear protestors, Drake cannot even allege, much less establish, an imminent harm.  The Vietnam-era cases involved defense claims that the United States was engaged in either an immoral, illegal war, in which innocent citizens were being conscripted and sent to fight.  The nuclear protest cases involved claims that the United States was violating international law and inviting nuclear war by possessing and conducting military exercises involving nuclear weapons.

Here, by contrast, the defendant's claim involves his objections to the procurement process at the NSA.  It involves not the debate over whether a war is just or legal, or the propriety of  nuclear weapons, but whether a particular program was more or less appropriate for funding and deployment.  As a result, not only is it unclear that the defendant chose the lesser evil, but also defendant's illegal actions placed in jeopardy years and years and billions of dollars of investment into classified NSA programs had they been disclosed due to his conduct.  The defendant's illegal retention of classified NSA documents in hard copy in his basement, and on his computer connected to the Internet, presented a serious risk that outside individuals, entities, or nations could gather vital, sensitive information related to the NSA and its activities.  This

included, among other things, information revealing NSA mission sites, technical capabilities, and budget funding details.

Just as importantly, by 2007, the timeframe of the charges in this case, there was no imminent harm faced by the defendant, because Classified Program A had incorporated elements of Classified Program B, and also because NSA had transitioned away from Classified Program A to Classified Program 1.  As explained in Maxwell, "the term 'imminent harm' connotes a real emergency, a crisis involving immediate danger to oneself or to a third party."  254 F.3d at 27 (citing United States v. Newcomb, 6 F.3d 1129, 1135–36 (6th Cir. 1993), and United States v. Seward, 687 F.2d 1270, 1276 (10th Cir. 1982)).  By the time of the search warrant executed at the defendant's home in November 2007, there was simply no imminent harm contemplated, much less avoided by, the defendant's conduct.

(b) <i>Lack of Legal Alternatives</i>

The second prong of the necessity defense also demonstrates why the defendant should be barred from relying upon it.  The defendant had numerous legal alternatives available in order to protest or complain about Classified Programs A and B.  The defendant could have also filed a complaint with the NSA Office of Inspector General, detailing his concerns about the two Classified Programs.  After his friend, the former congressional staffer, retired in April 2002, the defendant could have gone to another staff member of the House Permanent Select Committee on Intelligence to report his concerns.  The defendant could have gone to the Senate Select Committee on Intelligence.  And the defendant could have signed the complaint letter filed with the DOD IG, instead of merely providing information to the DOD IG auditors without informing them of his contact and personal relationships with the complaint's authors.

At a more fundamental level, however, this prong is not met because the defendant simply did not need to take these documents home.  The defendant could have engaged fully in any debate over these programs from his office and computer at the NSA. Indeed, one of the charged documents, entitled "Collection Sites," that was found at the defendant's home includes material taken from a classified email sent by the defendant to a DOD IG auditor.  This evidence of contact with the DOD IG auditors from his work email shows that the defendant was fully aware of  the legitimate means to protest, and that his decision to bring classified documents was a deliberate one.

The defendant might respond that legitimate protests, i.e. his contact with DOD IG auditors, were unsuccessful and thus no longer viable.  This, however, is answered by the Ninth Circuit's opinion in <u>Dorrell</u>, where the defendant claimed that his protests against the MX missile program had failed, leaving him no other alternative.  The court held that the defendant there "differs little from many whose passionate beliefs are rejected by the will of the majority legitimately expressed." <u>Dorrell</u>, 758 at 432.  To accept the justification defense because alternative means were available but unsuccessful "would amount to recognizing that an individual may assert a defense to criminal charges whenever he or she disagrees with a result reached by the political process." <u>Id.</u>  To accept the justification defense here would degrade the principle further, by recognizing a defense whenever a defendant disagrees with a result reached by the <u>procurement</u> process, and fundamentally undermining the system of classification for national security matters.

The defendant had numerous methods by which to complain about Classified Programs A and B.  In no way was he <u>required</u> to bring documents home and store them there in order to get

out his message.  In fact, quite the opposite.  As he admitted to the FBI, he corresponded with

Reporter A using encrypted Hushmails because he knew he would be fired if the NSA

discovered he was providing information to a news reporter.  The defendant's retention was far

from the only possible avenues to protest Classified Programs A and B.

(c)     <em>Reasonable Anticipation of Averting Harm</em>

The third prong of the analysis also weighs in favor of exclusion.  The defendant's

actions had no impact in the debate regarding the efficacy of Classified Programs A and B,

because NSA had begun transitioning to Classified Program 1 by 2006.  Put simply, the debate

was over.  "A defendant must demonstrate cause and effect between an act of protest and the

achievement of the goal of the protests by competent evidence," according to the First Circuit,

and here no such evidence exists.  <u>Maxwell</u>, 254 F.3d at 28.  As in the protest cases, the

defendant's actions—retaining classified documents in his home—bear no relation to cessation

of the alleged evil.  In fact, the protestor defendants had a stronger argument on this point,

because they were at least directly acting against the perceived harm, e.g. by burning draft

records.  The defendant here, by contrast, did not even act in order to affect Classified Programs

A or B.  Instead, he brought home and retained highly classified documents in a number of

different areas, thus potentially jeopardizing numerous programs that had nothing to do with

either of the Classified Programs.

Even if the defendant had been charged with disclosure of classified information for his

conduct as it relates to Reporter A, the defendant could not satisfy this prong.  This is because it

is unclear what specific end the defendant sought through his conduct.  As stated, the debate was

over.  Nor can he show that publication of details regarding Classified Program A or B would "shame" the NSA into either re-funding Program B or de-funding Program A.

The defendant cannot make out the elements of a necessity defense, and this Court should preclude any such evidence or argument.  The alternative is to allow the defendant to invite jury nullification by raising an irrelevant argument.  As explained by then-Judge John Paul Stevens in a Vietnam-era protestor case, "One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making.  Appellant's professed unselfish motivation, rather than a justification, actually identifies a form of arrogance which organized society cannot tolerate." United States v. Cullen, 454 F.2d 386, 392 (7th Cir. 1971).

**B.      Whistleblower Protection Act**

The defendant fares no better under the statutory protections of the Whistleblower Protection Act (WPA), 5 U.S.C. § 2302(b)(8), because the Act does not apply to criminal prosecutions.  It also does not apply to either NSA employees or to the retention and disclosure of classified information otherwise in violation of federal law.  Furthermore, the defendant may not make a First Amendment claim or use the Intelligence Community Whistleblower Protection Act (ICWPA) to avoid prosecution, as the former has been recently ruled out by Garcetti v. Ceballos, 547 U.S. 410 (2006), and the ICWPA does not protect the disclosure of classified information to the media, much less retention of classified documents at a private home.

        1.   Whistleblower Protection Act

In civil litigation, the WPA protects an employee who discloses information which he or she "reasonably believes" evidences a violation of law from a "prohibited personnel

practice."     5 U.S.C. § 2302(b)(8).[3]  However, the act "is *not* available as a defense in a

criminal trial."  United States v. Gustafson, 30 F.3d 134, at *2 (6th Cir. 1994) (unpublished op.).

As Gustafson explains, the Act prohibits an employer from taking a specified adverse personnel

action against an individual in retaliation for that person's disclosure of waste, fraud, and abuse

on the part of the employer.  Id.  For example, the defendant in Gustafson was convicted of

disorderly conduct, and he claimed that his statements and actions were disclosures of waste and

abuse under the Act.  Id.  The Sixth Circuit rejected this defense, holding that although the Act

could have been used as a defense against the brief administrative suspension the defendant

received because of the same incident, it provided no protection against a criminal prosecution.

Id.

     In addition, the WPA explicitly does not protect disclosures that are otherwise prohibited

by law or by Executive order.  5 U.S.C.A. § 2302(b)(8)(A)(i)-(ii).  The defendant's possession

was otherwise prohibited by 18 U.S.C. § 793(e).  Indeed, the defendant is not even charged with

disclosure, so the Act's protections are even more in applicable.  As a result, the Act does not

apply to his conduct.

     Finally, the defendant, as a NSA employee, is categorically excluded from protection

under the WPA.  The WPA prohibits the taking of personnel action against a "covered employee

---

[3]  Specifically, Section 2302(b)(8)(A) permits a federal government employee to make
disclosures of any information "which the employee . . . reasonably believes evidences":

(i) a violation of any law, rule, or regulation, or;
(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a
substantial and specific danger to public health or safety

if such disclosure is not specifically prohibited by law and if such information is
not specifically required by Executive order to be kept secret in the interest of
national defense or the conduct of foreign affairs.

of an agency." § 2302(a)(2)(A).  The statute defines an "agency" as "any Executive agency and

the Government Printing Office," and it excludes the NSA and other agencies dealing with

"foreign intelligence or counterintelligence activities."   § 2302(a)(2)(C)(ii).

      2.  First Amendment

Garcetti v. Ceballos similarly forecloses the possibility of the defendant claiming a First

Amendment right to free speech when he retained information at his home and disclosed

classified information to the media.  547 U.S. 410 (2006).  In Garcetti, the Court held that public

employees making statements in the course of their official duties are not speaking as private

citizens for First Amendment purposes.  The Court justified its holding by stating that

government employers need a "significant degree of control over their employees' words and

actions [because] without [that control], there would be little chance for the efficient provision of

public services."  Id. at  418.

      3.  Intelligence Community Whistleblower Protection Act

The Intelligence Community Whistleblower Protection Act (ICWPA), 5 U.S.C. App.

§ 8H, similarly provides no basis for the defendant to argue that his retention of classified

documents was justified.  The ICWPA allows certain government employees, including NSA

employees, to disclose classified information to Congress, in an effort to expose government

wrongdoing.  However, this act, like the WPA, does not apply to criminal prosecutions, nor does

it apply to the defendant's retention of classified documents.

Under the ICWPA, NSA employees are permitted to report to Congress or the Inspector

General of the Department of Defense if the matter is of "urgent concern," including:

(A)  A serious or flagrant problem, abuse, violation of law or Executive order, or
deficiency relating to the funding, administration, or operations of an intelligence
activity involving classified information, but does not include differences of

opinions concerning public policy matters.

 (B)  A false statement to Congress, or a willful withholding from Congress, on an issue of material fact relating to the funding, administration, or operation of an intelligence activity.

§ 8H(g)(1)(A-B).  In order for the ICWPA to apply, the government employee must exhaust specific procedural avenues to abide by the Act, thereby ensuring that the disclosure is protected. Disclosures of classified or otherwise protected information may be made to the Special Counsel or to an Inspector General of an agency or to an employee designated by the agency head to receive disclosures regardless of statutory Executive Order secrecy requirements or law prohibiting its disclosure.  § 2302(b)(8)(A).

The defendant's retention of documents at his home, and his disclosure of information to Reporter A, fall well outside the ICWPA's protections.  His conduct evinces little intent on his part to follow the protocol laid out in ICWPA, and the act simply does not apply in the criminal context.  As a result, he may not use the WPA or the ICWPA to shield his unauthorized retention of classified documents and disclosure of classified information to Reporter A.

## C.     Relevance

In light of the clear restrictions on the necessity defense outlined above, the defendant may seek an alternative route to introduce evidence of the DOD IG audit, or his alleged assistance to DOD IG auditors.  He may, for example, claim that it bears on his state of mind, or on whether his retention was willful.  This Court should reject any such effort, because that area of inquiry, and any related evidence, is simply irrelevant to the charges in this case.  Under Federal Rule of Evidence 401, evidence having any tendency to make the existence of "any fact that is of consequence" more or less likely is relevant. Pursuant to Rule 402, relevant evidence is

generally admissible, subject to the strictures of Rule 403, and irrelevant evidence is inadmissible.  As explained by the Fourth Circuit in United States v. Passaro, the fact that a case involves classified information or the Classified Procedures Act, 18 U.S.C. App.3 §§ 1—16, does not entitle either party to seek or admit irrelevant evidence.  "CIPA does not, however, alter the substantive rules of evidence, including the test for relevance: thus, it also permits the district court to exclude irrelevant, cumulative or corroborative classified evidence."  577 F.3d 207, 219—20 (4th Cir. 2009) (internal citations omitted).

Evidence of the defendant's motive regarding his retention of the documents, especially as it relates to the DOD IG audit, is insufficient to make out a necessity defense.  As a result, it also irrelevant.  See Maxwell, 254 at 23 (holding that the defendant has no right to present a defense on an irrelevant matter).  Whether phrased as a necessity defense or evidence relevant to "interpreting" or "putting in context" the defendant's state of mind, the clear import of such evidence is to justify his conduct, and this evidence of good motive or motivation should be excluded.  See Dorrell, 758 F.2d at 434—35 (upholding the redaction of irrelevant portions of defendant's statement that commented on his motivations).

Even if marginally relevant, a district court should exclude relevant evidence when "its probative value is 'substantially outweighed' by the potential for undue prejudice, confusion, delay or redundancy." United States v. Queen, 132 F.3d 991, 994 (4th Cir.1997) (quoting Fed.R.Evid. 403).  See also Old Chief v. United States, 519 U.S. 172, 182-186 (1997) (evidence may be excluded under Rule 403 if its probative value is substantially outweighed by certain dangers, including unfair prejudice, confusion of the issues, or misleading the jury); United States v. Aramony, 88 F.3d 1369, 1378 (4th Cir.1996)(internal quotation marks omitted)(stating

that evidence is unfairly prejudicial and excludable under Rule 403 "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and ... this risk is disproportionate to the probative value of the offered evidence.").  See also United States v. Mohamed, 410 F. Supp.2d 913, 917-18 (S.D. Ca. 2005) (excluding evidence whose probative value may be substantially outweighed by the "distraction and confusion" of a fair determination of the issues for the jury or the creation of "side issues or mini trials resulting in undue prejudice, undue delay, and waste of time.").

The test is always one of *unfair* prejudice, and "'[t]he mere fact that the evidence will damage the defendant's case is not enough.'" United States v. Benkahla, 530 F.3d 300, 310 (4th Cir. 2008)(quoting United States v. Hammoud, 381 F.3d 316, 341 (4th Cir.2004)) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005)).  See also Williams, 445 F.3d at 730.  "'[T]he evidence must be *unfairly* prejudicial, and the unfair prejudice must *substantially* outweigh the probative value of the evidence.'" Benkahla, 530 F.3d at 310 (quoting Hammoud, 381 F.3d at 341) (internal quotations omitted, emphasis in original)).  See also Williams, 445 F.3d at 730.

In this case, evidence of the DOD IG audit, the defendant's views of Classified Program A and B, and his contact with the DOD IG auditors would constitute evidence subject to Rule 403.  The evidence would needlessly distract the jury from the question of whether he had illegally retained classified documents and information, and instead convert the trial into an inquest of NSA budgetary and procurement priorities.  The defendant may wish for his criminal trial to become a forum on the technical advantages of Classified Programs A and B, but those debates, whether or not legitimate, cannot and do not inform the core questions in this case:

whether the defendant illegally retained the documents, whether he obstructed the FBI's investigation, and whether he made false statements to the FBI during his interviews.

## III.  CONCLUSION

The defendant cannot make out the elements of a necessity defense, and he is categorically barred from relying on the protections of the Whistleblower Protection Act Intelligence Community Whistleblower's Protection Act.  This Court should enter the attached order barring any evidence or argument on the issue.

/s/ William M. Welch II
Senior Litigation Counsel
United States Department of Justice
300 State Street, Suite 230
Springfield, MA 01105
413-785-0111 (direct)
413-785-0394 (fax)
William.Welch3@usdoj.gov

John P. Pearson
Trial Attorney
Public Integrity Section
United States Department of Justice
1400 New York Avenue, NW
Suite 12100
Washington, DC  20005
202-307-2281 (direct)
202-514-3003 (fax)
John.Pearson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have caused an electronic copy of the *Motion in Limine* to be served via ECF upon James Wyda and Deborah L. Boardman, counsel for defendant.


/s/ John P. Pearson
Trial Attorney
United States Department of Justice